Argued and submitted June 19, 2001, reversed and remanded April 3, 2002

Genevieve G. LAHMANN
and Roger A. Stolley,
*Plaintiffs,*
*and*

Elaine SHIMER,
*Respondent,*

*v.*

GRAND AERIE OF
FRATERNAL ORDER OF EAGLES,
Fraternal Order of Eagles,
Oregon State Aerie,
and Fraternal Order of Eagles,
Willamette Aerie No. 2081,
*Appellants.*

99C-17528; A110813

43 P3d 1130

Charles F. Hinkle argued the cause for appellants. With him on the briefs was Stoel Rives LLP.

Dana L. Sullivan argued the cause for respondent. With her on the brief was Hoevet, Snyder & Boise, P.C.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

KISTLER, J.

Edmonds, P. J., dissenting.

## KISTLER, J.

Plaintiff Elaine Shimer brought this action seeking a declaration that the Oregon Public Accommodation Act, ORS 30.670 *et seq.*,[1] requires the Fraternal Order of the Eagles to admit women as members.[2] On cross-motions for summary judgment, the trial court granted plaintiff's motion and denied defendants'. It held that the Fraternal Order of the Eagles is a "place of public accommodation" and thus may not exclude women. On appeal, the Eagles argue that the Public Accommodation Act was not intended to reach the membership policies of private organizations. In the Eagles' view, they remain free to exclude any person from membership on the basis of that person's race, sex, or religion. Although we do not agree that the Public Accommodation Act is as narrow as the Eagles perceive, we conclude that the court erred in resolving this case on summary judgment; the question whether the Fraternal Order of the Eagles is a "place of public accommodation" presents a disputed issue of material fact. We accordingly reverse and remand.

The Fraternal Order of the Eagles was founded in Seattle, Washington, in 1898. The order is divided into international, state, and local aeries, which engage in social service programs within the community and also provide social activities for their members. Since its founding, the order has been active in supporting the passage of workers' compensation laws, pension laws for workers and their families, and the federal social security act. Local aeries are also authorized to provide health and funeral benefits to their members.[3]

---

[1] ORS 30.670 through ORS 30.685 were renumbered in 2001 and are currently codified as ORS 659A.400 through ORS 659A.409. References to ORS 30.670 through ORS 30.685 in this opinion are to the 1999 version unless otherwise stated.

[2] Because two of the plaintiffs have dismissed their claims, only Shimer's claim remains. Defendants consist of the international Grand Aerie of the Fraternal Order of Eagles, the State of Oregon Aerie, and the local aerie, Willamette Aerie No. 2081. We refer to defendants collectively as the Eagles.

[3] The Eagles' brochure, "Active F.O.E. Membership and You," refers to the conditions for receiving sickness and injury benefits. Section 115.1 of the statutes that govern the Eagles authorizes each local aerie to provide its members with sickness, disability, and funeral benefits. However, the local aerie that plaintiff wants to join does not offer its members disability benefits. Although the local aerie previously had offered its members death benefits, no new member has been enrolled in the death benefit program for many years.

Local aeries actively recruit new members in the community, setting goals for new memberships and awarding prizes for those who recruit the most new members. Before November 1995, the eligibility requirements for membership in local aeries required that prospective members be at least 21 years of age, be of good moral character, believe in the existence of a supreme being, and be male. Women are not permitted to join, although there are ladies' auxiliary units at most of the local aeries. There are numerous events in which only aerie members—that is, men—can participate. These include weekly membership meetings and initiation ceremonies that are performed in accordance with memorized rituals. The rituals include various references to male virtue and brotherhood as well as prayers and references to God. At these meetings, the men also consider proposals relating to fund allotment for local aerie activities. Women who want to propose funding for particular activities must ask male aerie members to submit proposals on their behalf.

In November 1995, the Eagles Grand Tribunal issued an opinion in which it determined that the order must "yield to prevailing civil law" and remove the word "male" from its eligibility requirements. Consequently, local aeries were free to eliminate the gender restrictions in their local membership policies, although they were not required to do so. Aerie 2081, the local aerie that plaintiff wants to join, decided to admit women after learning about the Grand Tribunal's opinion. It ultimately admitted at least 15 women, two of whom have served on its board of trustees.

In July 1998, at its annual convention, the international Grand Aerie reversed its stance on admitting women. It notified all local aeries that applicants are required to be male and that any application not in compliance with that requirement would not be processed by the Grand Aerie. In light of the Grand Aerie's decision, Aerie 2081 decided that it would not admit any more women as members. Since that time, all women who have applied for membership have had their applications rejected.

Plaintiff has been a member of the ladies' auxiliary since December 1998, and she has volunteered substantial

amounts of time to the local aerie. She submitted her membership application to Aerie 2081 in February 1999, along with her application fee, because she wanted to be able to participate in the membership meetings and vote on important aerie issues. Because the aerie was no longer accepting applications from women, it rejected her application.

In June 1999, plaintiff was participating in a wagering game at Aerie 2081. During the course of the game, another player suggested a rule change. Plaintiff, along with several other female aerie members, auxiliary members, and male aerie members, objected to the rule change. Several days later, plaintiff received notice that Aerie 2081 was taking disciplinary action against her for "conduct unbecoming an Eagle," based upon the complaint that she made about the rule change. The only other members who were disciplined were female aerie members. The auxiliary members who had not applied for aerie membership were not disciplined, nor were any of the male aerie members. Plaintiff then initiated this action, seeking a declaration that the Eagles' "male only" membership policy violates the Public Accommodation Act.

On cross-motions for summary judgment, the trial court granted plaintiff's motion and denied defendants'. It ruled that the Public Accommodation Act applies to the Eagles because they emphasize recruitment and, except for a member's gender, are unselective in their membership policies. The court also determined that the Eagles are subject to the act because they consider business connections important and because they offer their services to the public. The trial court accordingly ruled that the Eagles cannot discriminate on the basis of gender and must allow women to become members.

On appeal, the Eagles argue that their order is not a "place of public accommodation" within the meaning of the act. More specifically, they argue that, in *Schwenk v. Boy Scouts of America*, 275 Or 327, 551 P2d 465 (1976), the Supreme Court held that the membership policies of a private organization are not subject to the Public Accommodation Act even though the goods and services that the organization provides to the public may be. The Eagles reason that the trial court erred when it failed to follow *Schwenk*. They

argue alternatively that, if the act applies to them, it violates the state and federal constitutions. We begin with the Eagles' statutory argument.

The Public Accommodation Act provides:

> "All persons within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, without any distinction, discrimination or restriction on account of race, religion, sex, marital status, color or national origin."

ORS 30.670. The phrase "[a] place of public accommodation" means "any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise." ORS 30.675(1). The statute also contains an exception from that definition; it provides that "a place of public accommodation does not include any institution, bona fide club or place of accommodation which is in its nature distinctly private." ORS 30.675(2).

As initially enacted, the Public Accommodation Act applied to any "place of public accommodation, resort, or amusement" and referred to hotels, motels, restaurants, taverns, and the like. *See* Or Laws 1953, ch 495, § 2; *Schwenk*, 275 Or at 332.[4] The focus was whether those places were open to the public except for persons of a particular race, religion, or national origin. Or Laws 1953, ch 495, §§ 1 and 2. The definition was amended in 1957 and again in 1961. Or Laws 1957, ch 724, § 1; Or Laws 1961, ch 247, § 1. As before, the definition was limited to specified kinds of places, and the most significant change was to extend the definition to "[a]ny place offering to the public goods or services." As the court explained in *Schwenk*, the 1961 Legislature expanded the definition "to end discrimination in health and beauty salons, barber shops and medical services." 275 Or at 333.

---

[4] The act was first enacted in 1953. *See* Or Laws 1953, ch 495, § 2. It provided:

"A place of public accommodation, resort or amusement shall mean any hotel, motel or motor court, any place offering to the public food or drink for consumption on the premises, or any place offering to the public entertainment, recreation or amusement[.]"

In 1973, the legislature amended the Public Accommodation Act to prohibit discrimination based on sex and marital status. Or Laws 1973, ch 714, § 1. The legislature also expanded the act's reach; it redefined the phrase a "place of public accommodation" to mean "any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise." *Id.* at § 2.

Three years later, in *Schwenk*, the court considered whether the Boy Scouts[5] were a "place of public accommodation" within the meaning of the act. There was little doubt that the Boy Scouts offered boys "advantages [and] privileges whether in the nature of * * * amusements or otherwise." The inquiry accordingly centered on whether the Boy Scouts were a "place or service" within the meaning of the definition. The Supreme Court explained that, because "the term 'place or service'" was ambiguous,[6] it was appropriate to review the 1973 act's legislative history to determine what that term meant. *Schwenk*, 275 Or at 331.

The court explained that the act was intended to " 'include literally all phases of *any business soliciting public patronage*,'" but that statements in the legislative history suggested that it probably would not include the YMCA or the YWCA. *Schwenk*, 275 Or at 333 (quoting the testimony of Eleanor Meyers) (emphasis in original).[7] The court concluded from the history that "the [legislature's] primary concern and purpose * * * was to prohibit discrimination by *business or commercial enterprises* which offer goods or services to the public." *Id.* at 334 (emphasis in original). The court noted

---

[5] The plaintiff in *Schwenk* wanted to be a Cub Scout; she sued the Boy Scouts because they operated the cub scout program she wanted to join. *Schwenk*, 275 Or at 329.

[6] The court described the statutory phrase "place or service" as a unitary "term," the meaning of which was ambiguous. *Schwenk*, 275 Or at 331. In inquiring what that term meant, the court did not distinguish between the words "place" and "service" or attempt to assign separate meanings to them. *See id.* at 334-35.

[7] The court noted that, when Eleanor Meyers was asked whether the bill would affect the YMCA and the YWCA, she replied:

" 'I don't believe it would as such. That's a question that needs further research. It depends on what services could be called distinctly private.' "

*Schwenk*, 275 Or at 334 (quoting Meyers' testimony).

that its conclusion was supported by the Bureau of Labor's summary of the 1973 amendments to the Public Accommodation Act, which explained:

> " *The legislative history is clear that [the amended definition of a place of public accommodation] is intended to be a broad one and to apply to all types of businesses which offer goods and / or services to the public.* This includes the services of credit, financing mortgages, loans, and insurance as well as hotels, motels, retail sales[.]' "

*Id.* at 335 (quoting the bureau's summary) (emphasis in original).

Having canvassed the legislative history, the court turned to the question whether the Public Accommodation Act applied to the Boy Scouts. It noted that, if, as it appeared, the legislature intended that the YMCA would not be subject to the act, then "it is difficult to see how the legislature could have intended any different application of that [a]ct to the Boy Scouts of America." *Id.* at 335. The court did not hold that the Boy Scouts or the YMCA came within the exclusion in subsection (2) for "bona fide club[s] * * * which [are in their] nature distinctly private." *Id.*; *see* ORS 30.675(2). Nor did it specifically identify what characteristic of either the YMCA or the Boy Scouts exempted them from the general definition of a place of public accommodation under subsection (1). *See* ORS 30.675(1). Rather, the court's holding rests on the syllogism that the act was not intended to reach the YMCA; that, for the purposes of this issue, the Boy Scouts and the YMCA were the same; and therefore, that the act did not apply to the Boy Scouts.

The court did not explicitly tie the conclusion that it drew from the legislative history—that "the [legislature's] primary concern and purpose * * * was to prohibit discrimination by *business or commercial enterprises* which offer goods or services to the public"—to its holding that the act does not apply to the YMCA and, by extension, to the Boy Scouts. It did explain, however, that "the legislative history of the Oregon Public Accommodation Act, *when taken as a whole*, is sufficiently clear so as to compel the conclusion that the term 'place of public accommodation,' * * * was not intended by the Oregon legislature to include the Boy Scouts

of America, at least to the extent of requiring it to accept applications by girls for membership." *Schwenk*, 275 Or at 336 (emphasis added). In light of the court's reliance on the whole legislative history, its rationale appears to be that the Boy Scouts are not a business or a commercial enterprise and thus are not subject to the Public Accommodation Act.

That is how we explained *Schwenk's* rationale when, 10 years later, we were asked to decide whether the Lions Club was a "place of public accommodation" within the meaning of the Oregon Public Accommodation Act. *See Lloyd Lions Club v. Int. Assoc. of Lions Clubs*, 81 Or App 151, 724 P2d 887 (1986), *rev dismissed* 303 Or 698 (1987).[8] We stated that the Supreme Court had construed the Public Accommodation Act in *Schwenk* "as prohibiting discrimination *only* 'by *business or commercial enterprises* which offer goods or services to the public.' " *Id.* at 153 (quoting *Schwenk*, 275 Or at 334) (first emphasis added; second emphasis in original). We agreed that, after *Schwenk*, the primary issue in *Lloyd Lions Club* was whether the Lions Club, as an organization, was a "community service organization [exempt from the act or] a business or commercial enterprise subject to [it]." 81 Or App at 154.[9] Relying on the trial court's factual findings, we held:

> "[D]efendant is a business which sells memberships and substantial concomitant business advantages to the male public throughout the state. Defendant is not a 'private' organization. It is open to virtually all, except women. Its revocation of the Lloyd club's charter was an action aimed at denying its business product and services to a segment of the population on the basis of sex."

81 Or App at 156-57.

---

[8] In *Lloyd Lions Club*, the International Association of Lions Clubs had revoked the Lloyd Lions Club's charter because it had accepted women as members. 81 Or App at 153. The local club brought an action against the international association alleging that the association had violated the Oregon Public Accommodation Act. *Id.*

[9] We did not frame the question as whether membership in the Lions, viewed separately, was a place or service subject to the act. *See Lloyd Lions Club*, 81 Or App at 156-57. Rather, the question that we answered was whether the national Lions organization was a business or commercial enterprise. *Id.*

Three propositions follow from *Lloyd Lions Club*. First, our opinion in *Lloyd Lions Club* rests on the proposition that a "place of public accommodation" is a business or commercial enterprise that offers privileges or advantages to the public. 81 Or App at 153. That proposition follows directly from *Schwenk*. Second, we recognized that, depending on the facts of a particular case, even community service organizations may be business or commercial enterprises for the purposes of the Public Accommodation Act. *Id.* at 157-58. Finally, we recognized that some private organizations may have such unrestrictive membership criteria that the organization is effectively open to the public. *Id.* at 157.

As we understand the Eagles' primary argument on appeal, they take issue with the final proposition noted above and argue that, in holding that the membership policies of private organizations may be subject to the Public Accommodation Act, our opinion in *Lloyd Lions Club* impermissibly departed from the Supreme Court's decision in *Schwenk*. We disagree with that argument for at least two reasons. As explained above, the court did not hold in *Schwenk* that every private organization's membership policies are exempt from scrutiny under the Public Accommodation Act. Nothing in *Schwenk* is inconsistent with our recognition in *Lloyd Lions Club* that some nominally private organizations may be so unselective in their membership criteria that they are effectively public.

Beyond that, the argument that the Eagles advance on appeal is at odds with the text of the statute. As noted above, ORS 30.675 distinguishes between organizations that "offe[r] to the public" advantages or privileges, ORS 30.675(1), and "institution[s and] bona fide club[s]" that are "in [their] nature distinctly private," ORS 30.675(2). The former are subject to the Public Accommodation Act; the latter are not. In exempting "distinctly private" organizations from the act's reach, the legislature made clear that the act applies to organizations that are only nominally private. Put another way, the legislature's use of the phrase "distinctly private" reflects a recognition that the evidence may show, in any given case, that some ostensibly private organizations have such unrestrictive membership criteria that they are effectively public. Our decision in *Lloyd Lions Club* gives effect to

that textual distinction. We find no reason to depart from it. *See Newell v. Weston,* 156 Or App 371, 380, 965 P2d 1039 (1998), *rev den* 329 Or 318 (1999) (stating the standard for overruling our own cases).

The dissent takes a different tack. It starts from the proposition that membership in the Eagles is a discrete "service" within the meaning of the Public Accommodation Act that should be examined separately. 180 Or App at 440 (Edmonds, P. J., dissenting). Relying on legislative history, the dissent concludes that the act applies to "commercial 'services' that, in their provision of goods, services, lodging, amusements or other things, impact females in their financial, vocational, and income-earning activities and interests." *Id.* at 442.[10] Because the dissent concludes that membership in the Eagles "provides solely fraternal benefits without the accompanying purpose of providing any economic advantages," it would hold "[a]s a matter of law [that] the membership service offered by the Eagles is not subject to the act[.]" *Id.* at 436.

We are not persuaded by the dissent's analysis for three reasons. First, it is difficult to square the dissent's analysis with the court's interpretation of the Public Accommodation Act in *Schwenk* and our explanation of both the act and *Schwenk* in *Lloyd Lions Club*. After reviewing the legislative history of the 1973 amendments to the act, the court explained in *Schwenk* that "the primary concern and purpose of the Oregon legislature in its enactment of the Oregon Public Accommodation Act was to prohibit discrimination by *business or commercial enterprises* which offer goods and services to the public." 275 Or at 334 (emphasis in original). The limiting principle that the court drew from the legislative history turned on the nature of the place or service, not the type of "accommodations, advantages, facilities or privileges" it provides. After *Schwenk,* the question is

---

[10] It appears from this statement that the dissent would engage in a two-part inquiry in determining whether a service is a place of public accommodation. It would ask initially whether the service is commercial rather than noncommercial. It would ask next whether the service offers business-related or economic advantages. Only if the answer to both questions is "yes" would the dissent hold that the service is subject to the Public Accommodation Act.

whether a place or service is a "business or commercial enter-pris[e]," not whether it offers business-related advantages or privileges. Under *Schwenk*, a business, such as an amuse-ment park or a dating service, may not discriminate against persons based on their race, sex, or religion. That is so even though the benefits those two businesses offer are recrea-tional rather than business-related.[11]

Were there any doubt about the question, our deci-sion in *Lloyd Lions Club* removed it. It bears repeating what we stated in *Lloyd Lions Club*: "In *Schwenk* * * *, the Supreme Court construed those provisions [of the Public Accommodation Act] as prohibiting discrimination *only* 'by *business or commercial enterprises* which offer goods or serv-ices to the public.' " *Lloyd Lions Club*, 81 Or App at 153 (quot-ing *Schwenk*, 275 Or at 334) (first emphasis added; second emphasis in original). The dissent would depart from *Schwenk* and *Lloyd Lions Club* and hold that membership in an organization will be subject to the Public Accommodation Act only when the benefits that membership entails "impact females in their financial, vocational, and income-earning activities and interests." 180 Or App at 442 (Edmonds, P. J., dissenting). That distinction is at odds with our explanation of *Schwenk*'s holding in *Lloyd Lions Club* and our reasoning in that decision.[12] Similarly, nothing in the *Schwenk* court's discussion of the legislative history supports it.

Second, the dissent's analysis is difficult to square with the text of the Public Accommodation Act. The dissent would hold that the question whether a service is a place of public accommodation turns on the type of benefits that the service provides. ORS 30.675(1), however, provides that a

---

[11] The dissent relies on the reference to "business or commercial activities" in Justice O'Connell's dissenting opinion in *Schwenk* to support its reading of the majority opinion in that case. 180 Or App at 439 (Edmonds, P. J., dissenting). Not only is the phrase "business or commercial activities" consistent with our under-standing of the majority opinion, but Justice O'Connell later referred to the "major-ity's conclusion that the legislature intended the public accommodatio[n] act to apply only to business or commercial *enterprises*." *Schwenk*, 275 Or at 342 (O'Connell, J., dissenting) (emphasis added).

[12] In *Lloyd Lions Club*, we reasoned that the national Lions organization was itself a business, that its members were its customers, and that membership in the organization was the commodity that it sold them. 81 Or App at 156.

place of public accommodation means "any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise." The statute does not say that the term "place or service" is limited to organizations that offer only business-related benefits or advantages to the public. It says precisely the opposite. According to the text of the statute, the term means "any * * * service offering * * * facilities or privileges whether in the nature of goods, services, lodgings, *amusements or otherwise*." (Emphasis added.)[13]

Finally, the dissent reasons that the legislative history reveals that the "legislature also focused on commercial 'services' that, in their provision of goods, services, lodging, amusements, or other things, impact females in their financial, vocational, and income-earning activities and interests." 180 Or App at 442 (Edmonds, P. J., dissenting). The dissent concludes: "In the legislature's view, the kinds of services that the act addresses are those involving financial matters or those in which business people associate together in such a way that the exclusion of females would disadvantage them." *Id.* at 442.[14] To be sure, some of the legislative history is directed to places and services that affect a woman's ability to compete on equal terms with men in the business and financial world. But the legislature's concern for equality was not that limited.

Eleanor Meyers, the representative from the Civil Rights Division of the Bureau of Labor, testified:

---

[13] Textually, the definition of a place of public accommodation divides into three parts: The phrase means "[1] any place or service [2] offering to the public [3] accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise." ORS 30.675(1). In *Schwenk*, the court addressed the first part of that definition. It held that the "term 'place or service' " was ambiguous and interpreted it. *Schwenk*, 275 Or at 331. The court did not address the third part of the definition, which is unambiguously broad.

[14] Although the dissent reasons that the legislature focused on places and services that affect women in their business and financial lives, *see* 180 Or App at 441-42 (Edmonds, P. J., dissenting), it apparently would apply the limitation that it draws from the legislative history to services but not to places. The dissent never explains why the limiting principle it derives from the legislative history would not apply equally to both places and services, since the *Schwenk* court recognized that both words were ambiguous. *See Schwenk*, 275 Or at 331.

"The Bureau of Labor has heard from citizens about experiences indicating discrimination because of one's sex exists in some restaurant facilities, some hotel and motel rental practices, some practices in the sale of business services, and a large number of experiences related to the granting of credit services."

Testimony, House State and Federal Affairs Committee, HB 2116, March 2, 1973, Ex 1 (statement of Eleanor Meyers). As Meyers' testimony makes clear, the concern about equality for women was not limited to ensuring equality in business-related services but extended as well to equal treatment in renting motel and hotel rooms and to a woman's ability to obtain credit on the same terms as a man. Similarly, in arguing that discrimination on the basis of sex should be prohibited, Jane Edwards explained that there was no rational basis for excluding women from taverns, without suggesting that equality of access to taverns related to anything other than social activities. Testimony, House State and Federal Affairs Committee, HB 2116, March 2, 1973, Ex 6 (statement of Jane Edwards). The legislative history provides no reason to impose the limit that the dissent would on the statute's text.

Our understanding of the legislative history "is also supported by the views expressed by the then Administrator of the Civil Rights Division of the Oregon Bureau of Labor in a summary of the Public Accommodation Act entitled 'House Bill 216—1973 Amendments to Laws Against Discrimination' and prepared shortly after passage of the 1973 Amendments." *See Schwenk*, 275 Or at 334.[15] The administrator explained:

"Because of the growing concern over the credit practices of various financial institutions the question was raised as to what constituted a 'place of public accommodation' and specifically whether the offering of credit and related services

---

[15] The Supreme Court relied on another portion of this summary to support the conclusion that it drew from the legislative history. *See Schwenk*, 275 Or at 334-35. Generally, after-the-fact summaries of legislative history have little, if any, weight in determining what the legislature intended. We rely, however, on the summary only to the same extent that the court did—as support for the conclusion that we draw from the testimony that was before the legislature when it enacted the 1973 amendments.

fell within the scope of this provision. The definition of a 'place of public accommodation' was therefore changed to make very clear that the law applies to *any* place offering *any* kind of goods or services to the public, including institutions which offer credit."

Oregon State Bar CLE, 1973 Legislation 186 (1973) (emphasis added). Consistently with that explanation, the legislative history reveals that the 1973 Legislature did not intend to limit a person's access to organizations depending on the type of benefits they offered.

We accordingly adhere to our decision in *Lloyd Lions Club* that the question whether an organization is a place of public accommodation turns on (1) whether it is a business or commercial enterprise and (2) whether its membership policies are so unselective that the organization can fairly be said to offer its services to the public. In this case, we reverse and remand to allow the trier of fact to determine whether the Eagles are, like the Lions, in the business of selling memberships and whether their membership criteria are unselective. This case arises on summary judgment, and there is evidence in this record that the Eagles are as much in the business of selling memberships as the Lions were. There is also evidence that, except for the Eagles' decision to exclude women, they are as unselective in whom they admit as the Lions. Put another way, the trier of fact reasonably could find that the Eagles are a business and that their membership criteria are so generally unselective that they offer their product— membership in their organization—to the public.

To be sure, the nature of the Eagles' product differs from that of the Lions. Although the Eagles' local organizations are authorized to offer disability and death benefits to their members, the Eagles generally appear to offer more civic and social benefits and fewer economic or business advantages than the Lions offered. But that difference would not preclude the trial court from finding that the Eagles are a business subject to the act. As noted above, the act is not limited to businesses that supply economic or business advantages. Rather, it applies to businesses that offer to the public "accommodations, advantages, facilities or privileges

whether in the nature of goods, services, lodgings, amusements or otherwise." ORS 30.675(1).

Although the facts in this case are comparable to those in *Lloyd Lions Club* and the trier of fact properly could find as a factual matter that the Eagles are a place of public accommodation, we cannot say as a matter of law that it was required to do so. Indeed, in *Lloyd Lions Club*, we declined the defendant's invitation to review *de novo* the "critical disputed findings of the trial judge in this case * * * that defendant is in the business of selling memberships and that its membership criteria for men are unselective," 81 Or App at 155 n 2, and we relied on the trial court's resolution of that factual issue. As we implicitly recognized in *Lloyd Lions Club*, the trial court in that case could have drawn competing inferences whether the Lions were a community service or a commercial organization, and we conclude that the trier of fact could have done so here as well.[16] We accordingly reverse the judgment and remand the case for a trial to determine whether the Eagles are subject to the Public Accommodation Act. *See Lloyd Lions Club*, 81 Or App at 156-57.

We note one final point. The dissent reasons that, if the Public Accommodation Act applies to the Eagles, it violates the right of association protected by the state and federal constitutions. In our view, it would be premature to reach those issues until the historical facts that underlie whether the Public Accommodation Act applies to the Eagles are resolved at trial. Not only would we be reaching a constitutional issue that could potentially be resolved on statutory grounds, but the parties may also develop additional facts on

---

[16] The dissent reasons that a passage from Genevieve Lahmann's affidavit should not have been admitted. 180 Or App at 451-52 (Edmonds, P. J., dissenting). It also reasons that an advertisement offering a discount to Eagles' members, although admissible, does not reflect the Eagles' policy. *Id.* at 452-53. Both pieces of evidence bear on the question that the dissent would find dispositive—whether the Eagles offer business-related benefits. As explained above, however, the question is whether the Eagles are a business or commercial enterprise, not whether they offer business-related benefits. Beyond that, defendants moved to strike only one clause in the passage that the dissent quotes from Lahmann's affidavit. They moved to strike the clause, "Others consider Eagles membership to be a benefit to their business interests." Not only have defendants not assigned error to the trial court's ruling on their motion to strike, but, even if the court had struck the statement, the remainder of the sentence, which was not the subject of defendant's motion to strike, makes the same point. The next clause in the sentence states: "Eagles are encouraged to patronize the businesses of fellow Eagles members."

remand that will bear on the constitutional issue if the trier of fact finds that the act applies to the Eagles.[17]

Reversed and remanded.

**EDMONDS, P. J.,** dissenting.

The majority errs when it holds that summary judgment under ORCP 47 is precluded in this case. It concludes that there is a question of material fact as to whether membership in the Fraternal Order of Eagles (Eagles) is subject to Oregon's Public Accommodation Act (act) because "the Eagles are, like the Lions, in the business of selling memberships" and "the trier of fact reasonably could find that the Eagles are a business and that their membership criteria are so generally unselective that they offer their product— membership in their organization—to the public." 180 Or App at 434. The majority misinterprets the meaning of the act and the Supreme Court case interpreting it. Once the act is properly interpreted, no genuine issue of material fact remains. As a matter of law, the membership service offered by the Eagles is not subject to the act because it provides solely fraternal benefits without the accompanying purpose of providing any economic advantages.

The text and context of the act is the starting point in the analysis. ORS 30.670 (1999)[1] provides:

"(1) All persons within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, without any distinction, discrimination or

---

[17] For example, although the Eagles no longer accept women as members, it appears that the women who were admitted from 1995 to 1998 remain in the organization. If so, their continued presence may bear on the question whether including women within the Eagles would force the organization to send a message concerning women with which the Eagles disagree. *Compare Boy Scouts of America v. Dale*, 530 US 640, 653, 120 S Ct 2446, 147 L Ed 2d 554 (2000) (requiring the Boy Scouts to accept a gay scout leader would "force the organization to send a message * * * that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior," a message with which the Scouts disagreed), *with Roberts v. United States Jaycees*, 468 US 609, 617-29, 104 S Ct 3244, 82 L Ed 2d 462 (1984) (concluding after a fact-intensive analysis that requiring the Jaycees to include women as members would not affect their constitutionally protected associational interests).

[1] ORS 30.670 through ORS 30.685 were renumbered in 2001 and are currently ORS 659A.400 through ORS 659A.409. References to ORS 30.670 through ORS 30.685 in this opinion are to the 1999 version unless otherwise stated. .

restriction on account of race, religion, sex, marital status, color or national origin."

ORS 30.675 provides:

"(1)   A place of public accommodation, subject to the exclusion in subsection (2) of this section, means any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise.

"(2)   However, a place of public accommodation does not include any institution, bona fide club or place of accommodation which is in its nature distinctly private."

To understand what is in issue in this case in light of the above statutes, it is important to identify what is not in issue. The Eagles are not, at least for purposes of this case, a "bona fide club or accommodation which is in its nature distinctly private." Some of their activities, including the furnishing of food, beverages, and social amusements, are not distinctly private and, in fact, the evidence shows that those activities are open to both genders. Consequently, ORS 30.675(2) has no application to this case. Second, the membership activity of the Eagles is not "a *place* * * * offering to the public accommodations, advantages, or facilities" within the meaning of subsection (1). ORS 30.675(1) (emphasis added). A "place" within the definition of the phrase "place of public accommodation" in ORS 30.675(1) connotes a physical locale. Although an Eagles' lodge could be a "place" within that definition for purposes of the activities that are open to the public, physical access to the lodge is not the issue in this case. That leaves only one alternative for coverage under ORS 30.675(1). Does membership in the Eagles constitute a "service" within the meaning of the word in the statute as contemplated by the legislature? If it does not constitute a "service," then it is not subject to the act, regardless of the fact that the Eagles's other activities could be subject to the act.

In *Schwenk v. Boy Scouts of America*, 275 Or 327, 551 P2d 465 (1976), the Supreme Court held that the word "service" has a specialized particular meaning within the act. It is the majority's misunderstanding of what the *Schwenk*

court said about the word "service" that leads it to an erroneous analysis. As I discuss below, the word "service" in the statute, as *Schwenk* interpreted it, encompasses only those activities or advantages of accommodations, advantages, facilities, or privileges that are commercial in nature, *e.g.*, those that the legislature wanted to be made available to the public without discrimination by the offeror. That limitation on the definition of the word "service" is not my creation from whole cloth; it is found in *Schwenk* and in the legislative history of the act. It is also compelled by a comparison of the results in *Schwenk* with the legislative history.

In *Schwenk*, a nine-year-old girl brought an action under the act through her guardian ad litem. She alleged a violation of the act as the result of the Boy Scouts' refusal to accept her application as a cub scout because she was a female rather than a male. She did not allege that the Boy Scouts were subject to the act because they were a business or a commercial organization. Rather, she alleged that the Boy Scouts offered "scouting services and programs to members of the public in Oregon." *Schwenk*, 275 Or at 329. She argued that they were subject to the act because membership in the Boy Scouts is a service and therefore a place of public accommodation. In response, the defendant contended, among other things, that the legislative history of the act demonstrates that its purpose was "to bar discrimination in *businesses* which offer goods or services to the public." *Id.* at 331 (emphasis in original). In its analysis to determine the legislature's intent, the court held that the words "place or service" in subsection (1) were ambiguous, and it therefore turned to the legislative history of the act to determine the legislature's intent.

After examining the legislative history, the court said:

"It would appear from the foregoing that the primary concern and purpose of the Oregon legislature in its enactment of the Oregon Public Accommodation Act was to prohibit discrimination by *business or commercial enterprises* which offer goods or services to the public.

"* * * * *

"It may be true, as contended by plaintiff, that the Boy Scouts of America is not a 'bona fide club or place of accommodation which is in its nature distinctly private,' so as to come within the exception provided by [ORS 30.675(2)] from compliance with provisions of the [act]. The same may also be true of the YMCA and YWCA.

"If, however, as would appear from the legislative history of that Act, the Oregon Legislature *intended that services offered by the YMCA and YWCA would not be subject to the provisions of the act (with the possible exception of the operation of facilities for 'public accommodation' without membership rights)*, it is difficult to see how the legislature could have intended any different application of that Act to the Boy Scouts of America." *Id.* at 334-35 (first emphasis in original; second emphasis added).

The court concluded:

"In our opinion, however, the legislative history of the [act], when taken as a whole, is sufficiently clear so as to compel the conclusion that the term 'place of public accommodation' as defined by ORS 30.675, as amended in 1973, was not intended by the Oregon legislature to include the Boy Scouts of America, *at least to the extent of requiring it to accept applications by girls for membership*." *Id.* at 336 (emphasis added).

Justice O'Connell dissented. He said, "I find nothing in the Act nor in the legislative background of the Act which suggests that it was to apply only to business or commercial activities." *Id.* at 337. He asserted, "There is nothing about the wording of the Oregon Act which suggests that it was intended to be confined to commercial activities[.]" *Id.* at 339. He explained, "I cannot accept the majority's narrow interpretation of the Act, limiting it to commercial activities or to material advantages such as the obtention of credit." *Id.* at 341. O'Connell said, "The recurring distinction in the legislative history is between that which is a public accommodation and that which is 'distinctly private'; it is not the distinction between commercial and non-commercial relied upon in the majority opinion." *Id.* at 342. The *Schwenk* majority did not assert that O'Connell misstated its position that the act focuses on commercial *activities* and *advantages*.

In summary, the plaintiff in *Schwenk* argued that the Boy Scouts were subject to the act because they offered membership services broadly to the public. The Boy Scouts countered that the purpose of the act was to bar discrimination *only* in businesses or commercial enterprises that offer services to the public and that they were not a business or commercial enterprise. The *Schwenk* court did not adopt *either* interpretation of the act advanced by the parties. Its methodology is clear. It acknowledged, as the plaintiff contended, that the Boy Scouts organization was not an exempt club or place of private accommodation under ORS 30.675(2), as also could "be true of the YMCA and YWCA." *Schwenk*, 275 Or at 335. It then made a comparison of the membership services of the Boy Scouts with the membership services offered by the YMCA and the YWCA. It noted that the legislature did not intend the act to cover the membership services of the YMCA and the YWCA. In light of that fact, it concluded that "it is difficult to see how the legislature could have intended any different application" of the act to the Boy Scouts. *Id.*

What is most significant in regard to the majority's interpretation of *Schwenk* in this case is that neither the majority nor the dissenting opinion in *Schwenk* framed the inquiry as whether the Boy Scouts are subject to the act because they are a business or commercial enterprise. In other words, it was not germane to the *Schwenk* court's reasoning *whether or not* the YMCA, the YWCA and the Boy Scouts could be deemed business or commercial enterprises *as organizations*. Rather, for purposes of analysis of coverage under the act, the court focused on the separate membership activity of the Boy Scouts and evaluated it discretely. It was only by engaging in an "activity-by-activity" or "service-by-service" analysis, as the legislature intended, that the majority in *Schwenk* could have reached the conclusion that it did, and that methodology should control our analysis in this case.

Thus, following the lead of the *Schwenk* court, the proper analysis in this case begins with the understanding that the "place or service" phrase in ORS 30.675(1) is ambiguous, and that fact requires us to resort to the legislative history underlying the act.

The legislature added the "service" language in 1973. Or Laws 1973, ch 714, § 1. The overall tenor of the legislative history underlying the 1973 amendments demonstrates that the legislature sought to extend certain rights to females that the act had already extended to other groups.[2] As Jane Edwards testified before the House Committee,

"Many important business and economic decisions are made in public places which exclude women. Further it is

---

[2] *See, e.g.*, Testimony, House Committee State and Federal Affairs, HB 2116, March 2, 1973, Ex 1 (statement of Eleanor Meyers, representing the Bureau of Labor and Industries) ("The amendment simply adds sex as a class to the other classes protected from class discrimination in the full use of facilities and privileges of any place of public accommodation."). Meyers testified:

"Now where [the YMCA and YWCA] open *facilities* for public accommodation without membership rights, that's another thing. * * * I believe that use of their facilities is open to people of both sexes. It is the *membership* that is not open on an equal basis." (Emphasis added.)

When asked whether the gender-based *membership policies* of the YMCA and YWCA would be affected by the proposed bill, Meyers explained that "I don't think [the bill] would [affect the YMCA's membership] as such. That's a question that needs further research. It depends on what services could be called distinctly private." Tape recording, House Committee on State and Federal Affairs, HB 2116, March 2, 1973, Tape 4, Side 2.

Also, Representative Vera Katz, the bill's sponsor, testified before the House Committee and the Senate Committee on Consumer and Business Affairs regarding the proposed amendments. Tape recording, House Committee on State and Federal Affairs, HB 2116, March 2, 1973, Tape 4, Side 2. Katz told the committee a personal anecdote in which she was excluded from the male-only dining room of a local department store and about her surprise at learning of the department store's authority under the then-existing law to maintain separate dining rooms based on gender. *Id.* She then related that she had encountered many women during her political campaign who had been discriminated against because of their divorced status. *Id.* She told the Senate committee

"Now, present federal statutes and state statutes, as far as public accommodations, don't speak to sex—are silent to sex. They talk about race, color, national origin, but they don't speak to the point of sex. And men have the right to congregate, if they want to, without women. They've got their private clubs to do that in. *We're not forcing anybody to integrate, but we're trying to avoid segregation.* This bill does not talk to private clubs [or] government agencies." *Id.* (emphasis added).

In addition, Jane Edwards, representing the American Civil Liberties Union before a House committee, testified:

"Those who oppose laws prohibiting discrimination generally argue men (or women) have the right to congregate together without members of the opposite sex. This of course is true. However, *this bill is not trying to force people to integrate but to prevent public places from segregating.* Nothing in the bill precludes private clubs from segregating or precludes people from inviting only members of one sex or the other to their homes." Testimony, House State and Federal Affairs Committee, HB 2116, March 2, 1973, Ex 6 (emphasis added).

impossible for employers and society generally to recognize women as equal in business and professional communities and yet consider them inferior socially. The result is that unless places of public accommodations are open to persons of both sexes, discrimination in employment will continue." Testimony, House State and Federal Affairs Committee, HB 2116, March 2, 1973, Ex 6.

As emphatic as the legislature's desire was to provide certain benefits to females, it was equally clear that it intended the scope of the act to be limited. The "places" discussed by the legislature were commercial places like restaurants or other physical locations that offer "goods, services, lodgings, amusements or otherwise" to the public. In addition to commercial *places* that accommodate the public, the legislature also focused on commercial "services" that, in their provision of goods, services, lodging, amusements, or other things, impact females in their financial, vocational, and income-earning activities and interests. In the legislature's view, the kinds of services that the act addresses are those involving financial matters or those in which business people associate together in such a way that the exclusion of females would disadvantage them. Although those services have no fixed physical location, they are services that are or should be available to both genders to afford equality of economic opportunity.[3]

Thus, to summarize thus far, the statutory scheme as a whole is concerned with equal access by the public and provides, therefore, that all persons are entitled to the full and equal accommodation, advantages, facilities, and privileges of any place of public accommodation. ORS 30.670. For purposes of the act, a "place of public accommodation" is defined as either a place or a *service*. Thus, the phrase "places of public accommodation" in the statute includes *places* and *services* in which the legislature has said that the public has

---

[3] The majority's reliance on the *Schwenk* dissent's characterization of the majority opinion in *Schwenk*, 180 Or App at 431 n 11, and on an after-the-fact summary of legislative history, 180 Or App at 433, reflects exactly that point. In the after-the-fact legislative summary, the example used is the offering of credit, which, as addressed above, is the kind of "service" that often operates without a fixed physical location. Such a service has economic consequences to all members of the public. *See* Oregon State Bar CLE, 1973 Legislation 186 (1973).

an interest in access without discrimination. The word "service" in the statute must be applied in accordance with the legislature's intent, and the act excludes from coverage under ORS 30.675(1) those services that the legislature did not intend to be classified as "places[s] of public accommodation." The scope of the limitation is found in the examples and the statements in the legislative history. The *Schwenk* opinion refutes the use of the majority's "nature of the organization" test. Rather, the *Schwenk* court used a test that focused on the advantages provided by the Boy Scouts' membership service. *Schwenk* teaches us that the test to be applied under the act is whether the individual "service" to which access is sought (in this case, Eagles' membership service) provides the kind of benefit that the legislature intended to be to regulated by the act. If it does, it is a "service" subject to the act. If it does not, it is beyond legislative regulation. When that test is applied in this case, the answer becomes apparent. The membership service of the Eagles, in the words of Justice O'Connell, is not a "commercial" activity nor, in the words of the statute, does it provide business or commercial "accommodations, advantages, facilities or privileges whether in the nature of goods services, lodgings, amusements or otherwise." Consequently, the Eagles are entitled to summary judgment as a matter of law.

The majority interprets the act and the *Schwenk* opinion differently. According to its reasoning: (1) a "place of public accommodation" is a business or commercial enterprise that offers privileges or advantages to the public; (2) community service organizations may be business or commercial enterprises for purposes of the act; and (3) "some private organizations may have such unrestrictive membership criteria that the organization is effectively open to the public" for purposes of the act. 180 Or App at 429. As to *Schwenk*, it says:

> "[T]he court's holding rests on the syllogism that the act was not intended to reach the YMCA; that, for the purposes of this issue, the Boy Scouts and the YMCA were the same; and therefore, that the act did not apply to the Boy Scouts.
>
> "The court did not explicitly tie the conclusion that it drew from the legislative history—that 'the legislature's

primary concern and purpose * * * was to prohibit discrimination by business or commercial enterprises which offer goods or services to the public'—to its holding that the act does not apply to the YMCA and, by extension, to the Boy Scouts. It did explain, however, that 'the legislative history of the Oregon Public Accommodation Act, when taken as a whole, is sufficiently clear so as to compel the conclusion that the term 'place of public accommodation,' * * * was not intended to include the Boy Scouts of America, at least to the extent of requiring it to accept applications by girls for membership. *Schwenk*, 275 Or at 336 (emphasis added). In light of the court's reliance on the whole legislative history, its rationale appears to be that the Boy Scouts were not a business or a commercial enterprise and thus are not subject to the Public Accommodation Act." 180 Or App at 427-28.

The majority asserts that the limitation on the word "service" that *Schwenk* drew from the legislative history is based on "the nature of the place or service, not the type of 'accommodations, advantages, facilities or privileges' it provides." 180 Or App at 430. Finally, the majority says that my interpretation of the holding in *Schwenk* is at odds with Justice O'Connell's description of the majority's holding in *Schwenk* and the text of the statute because the statute's definition of "place of public accommodation" is not limited to organizations that offer only business-related benefits to their members but also refers in general to "goods, services, lodgings or otherwise." It believes (not unlike Justice O'Connell) that the act has a broader focus than a "woman's ability to compete on equal terms with men in the business and financial world." 180 Or App at 432.

I begin my response to the majority by discussing our disagreement about the holding in *Schwenk* because, in my view, *Schwenk* provides the foundation for a proper interpretation of the act. The majority says that the *Schwenk* court's "rationale appears to be that the Boy Scouts are not a business or commercial enterprise and thus are not subject to the Public Accommodation Act." 180 Or App at 427-28. Thus, under the majority's analysis, the *Schwenk* court decided that the Boy Scouts as an organization were not to be treated as a business or commercial enterprise under the act. As

stated previously, the opinions in *Schwenk* do not pose that issue or purport to answer it, and, necessarily, the majority must reach its understanding of the holding in *Schwenk* by inference. The majority correctly concedes that the *Schwenk* court "did not explicitly tie the conclusion that it drew" to the legislative history underlying the act. 180 Or App at 427. There is a good reason why the majority perceives a lack of support for its interpretation in the *Schwenk* opinion. When understood correctly, *Schwenk* was not decided on the basis that the Boy Scouts were not a business organization, but, rather, under an analysis that evaluated the offer of a membership service separately from the Boy Scouts' other activities.

Also, the majority's interpretation gives no effect to the *Schwenk* court's observation that, while the act could cover the YMCA's operations of facilities, it does not cover its offer of membership. If being a business or commercial enterprise is what makes the difference between coverage and noncoverage, then it is difficult to perceive how the *Schwenk* court could conclude that some of the YMCA's services are covered and others are not. The YMCA as an organization is either a business, or it is not; if that is the test for coverage, then all of its offerings of activities or advantages are covered by the act. Clearly, however, under the *Schwenk* court's interpretation of the act, some activities could be covered but others expressly are not.

Another conceptual problem with the majority's assertion that the act is intended to regulate only business or commercial organizations is that the *Schwenk* court declined to adopt a similar argument made by the Boy Scouts in that case. When faced with competing arguments by the plaintiff (that the Boy Scouts were subject to the act because they offered services and programs to the public) and by the Boy Scouts (that the purpose of the act was to bar discrimination only in businesses that offer goods or services to the public), the court, after resorting to the legislative history, focused on the advantages of the membership service offered by the Boy Scouts and concluded that its membership service was not the kind of service covered by the act.

The majority also proposes that the answer lies in "whether [the Eagles] membership policies are so unselective that the organization can fairly be said to offer its services to the public." 180 Or App at 434. One conceptual problem with that assertion is that the YMCA, the YWCA, and the Boy Scouts are all organizations that solicit the public for membership, and yet they were held not subject to the act by the *Schwenk* court. Moreover, had the *Schwenk* court adopted an "unselective offer to the public" test, it would have adopted the plaintiff's argument or Justice O'Connell's reasoning. O'Connell believed that the legislature intended the act to reach both commercial and noncommercial services. But, according to the *Schwenk* majority, a membership service that provides no economic or commercial advantage to its members falls into the category of a noncommercial service and is not subject to regulation under the act.

The majority also relies heavily on *Lloyd Lions Club v. Int. Assoc. of Lions Clubs,* 81 Or App 151, 724 P2d 887 (1986), *rev dismissed* 303 Or 698 (1987), in support of its interpretation of the act. It says that its understanding of the holding in *Schwenk* is also "how we explained *Schwenk*'s rationale when, 10 years later, we were asked to decide whether the Lions Club was a place of 'public accommodation' within the meaning of the Oregon Public Accommodation Act." 180 Or App at 428. In fact, *Lloyd Lions Club* is the perfect illustration of the "activity-by-activity" evaluation that must be used in order to give effect to the legislature's intent.

*Lloyd Lions Club* is an example of when a membership service is subject to ORS 30.675(1). It teaches that the legislature intended to regulate the membership service of organizations when membership in an organization is accompanied by concomitant business advantages. In that case, the court made a finding of fact that "defendant is a business which sells memberships *and substantial concomitant business advantages* * * *."* 81 Or App at 156-57 (emphasis added). On appeal, we explained that the Lions' revocation of the local club's charter because it admitted female members "was an action aimed at denying its *business product and*

*services* to a segment of the population." *Id.* at 157 (emphasis added). Our holding that the Lions were subject to the act was predicated on the finding that the Lions' membership service provides "substantial concomitant business advantages." As we said, the record demonstrates that "there is a 'definite business connection' in being a Lion." *Id.* at 155. In other words, the Lions were subject to the act not because they were a commercial or business organization but because, in offering the "service" of membership, they also provided business or professional advantages that, in the legislature's view, should be available to both genders. The record in this case is in direct contrast to the record in *Lloyd Lions Club*. There is no evidence that membership in the Eagles provides a concomitant business advantage.

The majority misunderstands this court's reasoning and holding in *Lloyd Lions Club*. It says that

"[w]e did not frame the question as whether membership in the Lions, viewed separately, was a place or service subject to the act. * * * Rather, the question that we answered was whether the national Lions organization was a business or commercial enterprise." 180 Or App at 428 n 9.

However, the majority's interpretation of our opinion—that coverage under the act turned on whether the Lions' national organization was a business—is refuted by what this court said in *Lloyd Lions Club*:

"Defendant also argues that, because it is a nonprofit organization, it follows *ipso facto* that it cannot be a business or commercial enterprise and therefore cannot be subject to the Act as construed in *Schwenk*. We disagree. *There is no automatic equivalency between an organization's overriding noncommercial character and the nature of specific activities it undertakes which are independent of its noncommercial activities*. The fact that defendant's primary purpose is to render benevolent services in the community does not mean that its active promotion and sale of memberships, with the inducement and the consequence of business advantages for members, cannot be and is not a *business or commercial activity*. Carried to its extreme, defendant's argument would allow charitable organizations to exclude persons from events such as public bake sales on the basis of race, sex, religion or the other considerations

forbidden by the Act." 81 Or App at 157-58 (emphasis added).

In other words, it does not follow from the fact that an organization, like the Lions is noncommercial in nature that it is not subject to the act. Rather, it was the business or commercial nature of the *activity* of selling membership, and the concomitant business advantage to members, that made the Lions subject to the act, despite its primarily noncommercial, benevolent purpose and its not-for-profit organizational nature.

The majority's focus on the word "enterprise" in the *Schwenk* opinion proves too much. The majority apparently would limit the term to one of its two possible meanings. An "enterprise" refers to "a unit of economic organization *or* activity." *Webster's Third New Int'l Dictionary*, 757 (unabridged ed 1993) (emphasis added). When the *Schwenk* court used the phrase "*business or commercial enterprises* which offer goods or services to the public" in its opinion, 275 Or at 334 (emphasis added), it included within that description those "units of economic activity" that have a commercial purpose. Consistently with *Schwenk*, this court's opinion in *Lloyd Lions Club* acknowledged the nature of the Lions organization but then turned its focus to the Lion's specific *activity* of offering membership and evaluated that activity for coverage under the act. Consistent with *Schwenk* and a proper understanding of our opinion in *Lloyd Lions Club*, the correct inquiry in this case is whether the offer of membership by the Eagles to the public carries with it a concomitant business advantage. That inquiry necessarily requires a focus on the activity of membership in the Eagles and the benefits or advantages offered to members, and not on whether the Eagles organization is a business.

The majority also says that my interpretation is at odds with the text of the act because

"[t]he statute does not say that the term 'place or service' is limited to organizations that offer only business-related benefits or advantages to the public[.] * * * According to the text of the statute, the term means 'any * * * service offering * * * facilities or privileges whether in the nature of

goods, services, lodgings, *amusements or otherwise.*" 180 Or App at 431-32. (Emphasis in original.)

It also says that the legislature's focus was not limited to economic concerns regarding females in the work place. The majority is only partially correct, and in substance, the majority's complaints constitute a quarrel with the *Schwenk* court, not with me. As the *Schwenk* court held, the word "service" in the statute is ambiguous. That conclusion led it to the legislative history of the act to discern the legislature's intent about any limitation on the meaning of the word "service" in the statute. As the *Schwenk* court held, the legislative history demonstrates that the legislature intended to limit the meaning of the word "service" in the statute to certain services and intended other "services" to be exempted from the act.

Implicitly, the majority concedes in its interpretation of the act that the legislature intended some limitation. According to it, the limitation is based on whether the offeror of services is a business or commercial *entity.* Thus, the majority proposes a "nature of the organization" test. Yet the statute on its face does not contain that limitation either. In effect, both my interpretation and the majority's place limitations on the word "service" in the statute, and the query becomes which proposed limitation is the correct one. The answer to that query necessarily depends on the legislative history and the *Schwenk* court's interpretation of that history. That analysis leads to the understanding from the legislative history that whether the Eagles' membership service was intended by the legislature to be exempt turns on whether the Eagles' membership service is like the membership service of the YMCA, the YWCA, and the Boy Scouts.

As to the majority's complaint that my interpretation is inconsistent with the legislature's intent to regulate those places that provide noneconomic activities or advantages of "amusements or otherwise," the *Schwenk* court observed that the act is intended "primarily" to regulate business or commercial *enterprises.* It does not follow from that statement by that court that noncommercial organizations

are excluded from regulation if they offer to the public amusements or other noneconomic activities or advantages through commercial enterprises. Thus, if a nonprofit organization operates a theme park, or drives a truck through neighborhoods, offering ice cream for sale, those activities constitute "places" or "services" that provide amusement and are therefore subject to the act. Those kinds of activities, although offered by a noncommercial *entity*, constitute commercial *enterprises* or *activities*. In contrast, the membership services of organizations like the YMCA, the YWCA, and the Boy Scouts have no indicia of commercial benefit or advantage to the member. The benefits of such services are associational in nature and, accordingly, are not subject to the act under the holding in *Schwenk*.

Finally, the majority asserts that "there is evidence in this record that the Eagles are as much in the business of selling memberships as the Lions were." 180 Or App at 434. If the majority means by that assertion that the Eagles are subject to the act because they actively solicit the public to recruit nonmembers and charge a fee for membership, then, again, the Boy Scouts, the YMCA, and the YWCA would also be subject to the act because they too are in "the business of selling memberships" to the public. But the solicitation of the public for membership, by itself, cannot trigger coverage under the act, or the *Schwenk* court would have held the Boy Scouts to be subject to the act, and the legislature would have considered the YMCA and YWCA to be subject to the act. The distinction between the membership services of those organizations and the membership service of the Lions can be based only on the fact that there was concomitant business advantage regarding membership in the Lions.

If, instead, the majority is asserting that there is a genuine issue of material fact in the record about whether the Eagles market their membership as providing a concomitant business or professional advantage, such as occurred in *Lloyd Lions Club*, then it asks the right question but reaches the wrong conclusion. The summary judgment record is devoid of evidence that the Eagles market themselves

as providing a business-related advantage to their members or that membership in the Eagles does, in fact, provide such a benefit.

The application materials and brochures of the Eagles used in the recruitment of members describe the purposes of membership as

> "fraternal services to All Our Members, Social Activities for Eagle Families, Civic Programs to Service the Community, Youth Guidance to Help Young People, Fun, Fellowship, [and] Fraternalism."

The preamble to defendants' constitution states the purposes of the organization, including,

> "[t]o unite fraternally for mutual benefit, protection, improvement, social enjoyment and association, all persons of good moral character who believe in a Supreme Being to inculcate the principles of liberty, truth, justice and equality, to perpetuate itself as a fraternal organization and to provide for its government."

According to the evidence, members are not even allowed to discuss business other than Eagles business at membership meetings. Also, members do not identify themselves by vocation on their membership materials, directories, name tags, or other materials. Each of the members who submitted an affidavit in this case stated that his or her membership was motivated by the attraction of associating with other like-minded individuals. The uncontradicted evidence demonstrates that the Eagles' membership policy seeks to draw individuals together by common bonds of shared beliefs and mutual respect for certain virtues, regardless of their professional, employment, or business status.

At most, the record shows that *some members* of the Eagles use their membership in the organization to promote their individual businesses. In her affidavit, Lahmann asserts:

> "Over the years, I have known many members of the Eagles. I have learned that people join the Eagles for many reasons. Some view the Local Aerie as a place to gather to socialize as adults with their families. Many support the

charitable work of the organization. Others like to participate in community activities. An Eagles member is welcome at any Local Aerie anywhere, so some people join so that they can take advantage of Local Aeries when they are traveling, knowing that there will be one place in town where they can safely socialize and meet people with whom they share at least one common bond. Others consider Eagles membership to be a benefit to their business interests, since Eagles are encouraged to patronize the businesses of fellow Eagles members."

Defendants moved to strike the above statement during the hearing on the parties' cross-motions for summary judgment and renewed their objection to the evidence on hearsay grounds on appeal. I would hold that the continuing objection to the evidence on hearsay grounds is sufficient to preserve the issue on appeal. ORCP 47 D requires an affidavit in support of a summary judgment motion to "set forth such facts as would be admissible in evidence." The above evidence regarding the benefits of Eagles membership does not comply with ORCP 47 D. Plaintiff's statement does not offer facts but rather makes a bald conclusion. Moreover, those conclusions are necessarily based on inadmissible hearsay. It does not even identify those "others" who perceive a business connection associated with Eagles membership. OEC 802. Plaintiff's evidence should have been stricken, and we should not consider it.

Even if it is not stricken as inadmissible evidence, Lahmann's affidavit does not suffice to raise a genuine issue of material fact under ORCP 47. Her assertion is that some members "consider Eagles membership to be a benefit to their business interests." That assertion has no probative value to the issue of whether the Eagles as an organization has promoted membership as a service that provides "substantial concomitant business advantages." Instead, it speaks about the perception or motivation of some members of the Eagles. The act, however, regulates the "place" or the "service" that offers accommodations to the public. Nothing in the affidavit establishes that the Eagles' offer of membership is an offer of a commercial activity or advantage.

The record also contains an advertisement by an Eagles member in the April 1999 edition of the "Eaglebeak,"

the monthly publication of the Local Aerie. The advertisement says:

> "MARSH CUSTOM
> TRACTOR SERVICE
> 362-4507
> [graphic deleted] Mobile: 851-4241 Free On-Site Estimates
> S E R V I C E S
> Mowing: Lots, Acreages, Fields Roto-tilling:
> Gardens, lots, Seedbeds
> DirtWork: Final Grading, Leveling, Building/
> Construction Sites, Driveway/Roads.
> Snowplowing: Driveways/Parking lots
> 10% Discount to Eagle Members      8/99"

As is the case with the evidence from plaintiff Lahmann's affidavit, the advertisement is not a promotion by the Eagles that membership in their organization will provide, in the language of *Lloyd Lions Club*, "substantial concomitant business advantages." Individual members of the Eagles are at liberty to offer whatever advantages they wish to other members, but those kinds of solicitations by members do not operate vicariously on behalf of the Eagles. Rather, ORS 30.675 makes it clear that services are subject to the act only when some activity or advantage, commercial in nature, is offered.

In summary, there is no evidence in this summary judgment record that demonstrates that the Eagles' membership service provides a concomitant economic or commercial advantage to their members. It is clear that, without that kind of evidence, or some other evidence showing that membership in the Eagles provides a benefit that the legislature intended to make subject to public accommodation, there is no coverage under the act. Applying the same test here that was applied in *Schwenk*—whether the membership service is a commercial service to which the legislature would want to ensure public access as a matter of right—it follows that the Eagles are entitled to summary judgment in their favor.

In addition, there are at least two constitutional interests at stake that are lurking in the background of this case and that are interrelated: the right of free association and the right of free exercise of religious expression. Both

interests find protection in the state and federal constitutions. The majority says that it is premature to reach the issue of whether the trial court's ruling infringes on those interests until the trial court resolves the historical facts. But the parties have framed the issues in this case to present a question of law, *i.e.*, coverage under the statute, and there are no controverted facts in the record that would preclude summary judgment. The facts are what they are, and we must determine their legal import under the language of the statute. Consequently, the constitutional issues cannot be sidestepped. If the trial court's and plaintiffs' interpretations of ORS 30.675(1) are correct, then the constitutionality of the statute is in question because it regulates fraternal organizations in a way that implicates those rights.

Under the First Amendment to the United States Constitution and Article I, section 26, of the Oregon Constitution, the members of the Eagles are guaranteed the freedom of intimate association with whomever they choose.[4] *See, e.g.*, *Roberts v. United States Jaycees*, 468 US 609, 104 S Ct 3244, 82 L Ed 2d 462 (1984). "[I]mpediments to the exercise of one's right to choose one's associates can violate the right of association protected by the First Amendment." *Hison v. King & Spalding*, 467 US 69, 80, 104 S Ct 2229, 81 L Ed 2d 59 (1984). In tracing the growing reach of state public accommodation laws, the United States Supreme Court also has pointed out:

"As the definition of 'public accommodation' has expanded from clearly commercial entities, such as restaurants, bars and hotels, to membership organizations such as the Boy Scouts, the potential for conflict between state public accommodations laws and the First Amendment rights of organization has increased." *Boy Scouts of America v. Dale*, 530 US 640, 656, 120 S Ct 2446, 147 L Ed 2d 554 (2000).

---

[4] Article I, section 26, of the Oregon Constitution, provides that "[n]o law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good[.]" The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble[.]"

That conflict will exist in this case under the majority's interpretation of ORS 30.675. The constitutional right of each member of the Eagles to associate only with persons of his own gender in his private associations will be infringed if the act is construed to require the Eagles to admit females as members. Because the membership meetings are intimate, private meetings in which members profess their beliefs and offer prayers together in secret, the government's forced inclusion of unwanted individuals will violate the rights of expressive association.

In *Boy Scouts of America*, 530 US at 646, the Court recognized that the "forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." For example, the Boy Scouts, if compelled to accept the presence of a homosexual scout leader, would be compelled to advance a viewpoint implicitly that they publicly condemn. *See Boy Scouts of America*, 530 US at 647 ("forcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it intends to express"); *see also Board of Directors of Rotary Int'l v. Rotary Club*, 481 US 537, 544, 107 S Ct 1940, 95 L Ed 2d 474 (1987). In *Roberts*, 468 US at 621, the court explained:

> "There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together. *Freedom of association therefore plainly presupposes a freedom not to associate*." (Emphasis added.)

Citizens are also guaranteed the freedom to engage in expressive religious activity under our constitutions.[5] That right is anchored in both the First Amendment guarantee of freedom of expression and the guarantee of free exercise of

---

[5] Article I, section 2, of the Oregon Constitution, provides that "[a]ll men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences." Article I, section 3, provides that "[n]o law shall in any case whatever control the free exercise, and enjoyment of religious opinions, or interfere with the rights of conscience."

religion. Similarly, that right exists under the state constitution, in Article I, section 2's guarantee of freedom of worship and Article I, section 3's guarantee of free exercise of religious opinion. The right to choose how one will engage in religious expression has two dimensions: the right to worship in words and ways of one's choosing and the right to be free from compulsion to worship in ways one does not wish to worship. Both the federal and the state constitutions guarantee the right of an individual to choose with whom to worship as part of their way to worship.

As to the state's interest in eliminating discrimination because of gender, the Supreme Court has drawn a distinction:

> "We recognized in cases such as *Roberts* and [*Board of Directors of Rotary Int'l*] that States have a compelling interest in eliminating discrimination against women in public accommodations. But in each of these cases we went on to conclude that the enforcement of these statutes would not materially interfere with the ideas that the organization sought to express." *Boy Scouts of America*, 530 US at 657.

No conclusion could be drawn here that the enforcement of ORS 30.675 against the Eagles would not materially interfere with the ideals of the organization. According to the membership rules of the Eagles, the membership meetings are conducted in strict privacy according to secret rituals with only members present. The secret oaths, affirmations, and prayers that occur at Eagles' members-only meetings emphasize belief in a Supreme Being, fraternalism, manly virtues, and brotherhood. Everyone in the meeting is required to participate in the affirmations and prayers and to share in the belief in a divine entity. The enforcement of the act against the Eagles would clearly interfere with the ideals that the Eagles seek to advance: the extolling of manly virtues and brotherhood in secret among males and the offering of prayers and affirmations to a Supreme Being in the company of like-minded males.

It is correct that the guarantees of freedom of association and freedom of worship are not absolute, but it is also clear that the state must have a compelling interest before it

can constitutionally override these guarantees. *See Cousins v. Wigoda*, 419 US 477, 488, 95 S Ct 541, 42 L Ed 2d 595 (1975). Here, there is no compelling state interest at stake because, as discussed above, there is no evidence that exclusion of females from membership in the Eagles affects their ability to compete economically or professionally. The only conceivable state interest at stake is forcible inclusion for the sake of inclusion, and that is an interest that cannot withstand constitutional scrutiny.[6]

In summary, there are no genuine issues of material fact to be determined in this case. ORS 30.675 regulates only those "services" in which the public has an interest in equal access. The evidence is uncontradicted that membership in the Eagles offers no business or economically related advantage or other advantage in which the public has an interest. The majority could not be more wrong. Its holding is contrary to the legislature's expressed intent, the Supreme Court's holding in *Schwenk*, and, if extended to its logical end, the United States and the Oregon constitutions.

I respectfully dissent.

---

[6] The *Lloyd Lions Club* case contained no facts that implicated the freedom of association and free exercise of religion guarantees of the constitutions.